

**CHS / ALL**
**Transmittal Number: 25452577**
**Date Processed: 08/26/2022**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Walgreens Distribution<br>Corporation Service Company- Wilmington, DELAWARE<br>251 Little Falls Dr<br>Wilmington, DE 19808-1674 |

| | |
|---|---|
| **Entity:** | Walgreen Co.<br>Entity ID Number  0501431 |
| **Entity Served:** | Walgreen Co. |
| **Title of Action:** | Nicole Stewart vs. Walgreen Co. |
| **Matter Name/ID:** | Nicole Stewart vs. Walgreen Co. (12832216) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Discrimination |
| **Court/Agency:** | Leon County Circuit Court, FL |
| **Case/Reference No:** | 2022 CA 000898 |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 08/25/2022 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Sender Information:** | Marie A. Mattox, P. A.<br>850-383-4800 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

EXHIBIT
A

AUG 2 5 2022

IN THE CIRCUIT COURT OF THE *4th*
SECOND JUDICIAL CIRCUIT, IN AND
FOR LEON COUNTY, FLORIDA

NICOLE STEWART,

     **Plaintiff,**

CASE NO.: 22-CA- 2022 CA 000898
FLA BAR NO.: 0739685

v.

WALGREEN CO.,

     **Defendant.**

_____/

THE STATE OF FLORIDA:

To Each Sheriff of the State:

     YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action on Defendant:

     **WALGREEN CO.**
     **c/o PRENTICE-HALL CORPORATION SYSTEM, INC. – REGISTERED AGENT**
     **1201 HAYS STREET, SUITE 105**
     **TALLAHASSEE, FL 32301**

     Each defendant is required to serve written defenses to the complaint or petition on **Marie A. Mattox, P. A.,** Plaintiff's attorney, whose address is **203 North Gadsden Street, Tallahassee, FL 32301,** within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court, either before serve on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

     DATED on _____5/31/2022_____, 2022.

                  CLERK OF THE CIRCUIT COURT



                  By: _____

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT, IN AND
FOR LEON COUNTY, FLORIDA

**NICOLE STEWART,**

      **Plaintiff,**

CASE NO.: 22-CA-
FLA BAR NO.: 0739685

v.

**WALGREEN CO.,**

      **Defendant.**

_____/

## COMPLAINT

Plaintiff, NICOLE STEWART, hereby sues Defendant, WALGREEN CO., and alleges:

### NATURE OF THE ACTION

1.      This is an action brought under the Florida Civil Rights Act, codified at Chapter 760, Florida Statutes and §448.102 et seq., Florida Statutes.

2.      This action involves claims which are, individually, in excess of Thirty Thousand Dollars ($30,000.00), exclusive of costs and interest.

### THE PARTIES

3.      At all times pertinent hereto, Plaintiff, NICOLE STEWART, has been a resident of the State of Florida and was employed by Defendant. Plaintiff is a member of a protected class due to her national origin, disability or perceived disability and she was retaliated against after reporting Defendant's unlawful employment practices.

4.      At all times pertinent hereto, Defendant, WALGREEN CO., has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

5.     Plaintiff has satisfied all conditions precedent to bringing this action in that Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations.  This action is timely filed thereafter.

## STATEMENT OF THE ULTIMATE FACTS

6.     Plaintiff, a multi-racial female of Jamaican descent, began her initial employment with Defendant on about March 2005 and held the position of Certified Senior Pharmacy Technician (full-time) at the time of her constructive termination on August 31, 2020.

7.     Despite her stellar work performance during her employment with Defendant. Plaintiff has been subjected to disparate treatment, different terms and conditions of employment, and was held to a different standard because of her national origin and actual or perceived disability, and because she reported Defendant's unlawful employment activities and was subject to retaliation thereafter.

8.     The disparate treatment and retaliation came at the hands of specifically but not limited to Store #6334 Pharmacy Manager Allen Yuricic ("Yuricic"), Store #11537 Pharmacy Manager Priti Amin ("Amin"), Store Manager Beth Kriausky ("Kriausky"), Store #4311 Store Manager Derek Williams ("Williams"), Pharmacy Manager Marva Williams-Bates ("Williams-Bates") and District Manager Michelle Brooks ("Brooks").

9.     Defendant initially hired Plaintiff in approximately March 2005 at a location in Miami, store #4915. Plaintiff was still a student at this time receiving formal education and training to receive a diploma for pharmacy technician and certification via Pharmacy Technician Certification Board (PTCB) prior to being hired. Plaintiff graduated from the program in August 2005.

2

10.     Plaintiff went on maternity leave in August 2005 after completing the program. Plaintiff returned to work November 2005 and worked at various locations until 2009. Plaintiff was then transferred to Defendant's Central Pharmacy Operations (CPO) as a data entry specialist. Defendant gave pharmacy employees the opportunity to accept a position with CPO or a severance package prepared by Corporate due to the reduction in pharmacy hours.

11.     Plaintiff worked with CPO until she was terminated in February 2010 due to her second pregnancy.

12.     In January 2019, Defendant rehired Plaintiff at one of their New York locations, store #6334. Plaintiff's position was Pharmacy Technician. During Plaintiff's interview with Yuricic, he made a 'joke' about her being a fugitive. A few days later, she overheard Yuricic referencing that she'll be going to Rikers as if Plaintiff had an alleged criminal history. Prior to being offered a job with Defendant, a background check is done which Plaintiff's did not raise any cause for concerns therefore Yuricic's comment was inappropriate.

13.     Upon Plaintiff's rehire, she needed updates on changes that were implemented in the pharmacy while she was gone along with a refresher of her duties. Pharmacy Manager Allen Yuricic misinformed Plaintiff on various occasions about standard procedures.

14.     Plaintiff became aware of these discrepancies when overhearing Yuricic train new hires. Yuricic would tell the new hires different standard procedures than Plaintiff.

15.     On April 18, 2019 Yuricic filled the wrong prescription for a patient under Plaintiff's initials. The medication was a CII narcotic that was entered, reviewed, filled, verified and sold by Yuricic. Before the patient left the store, he checked the description of the pill on his prescription leaflet with the pills in the vial and noticed it was different.

16.     Yuricic apologized, corrected the mistake and never made a STARS report. A STARS report is required to be completed by a pharmacist whenever there is an internal medication error for quality control and to assist with training opportunities.

17.     Yuricic not completing the STARS report is a violation of company's policy.

18.     Plaintiff received minimum support from the front-end leadership team when she called for assistance for more than three (3) customers being in line. Plaintiff was asked to work 12-hour shifts with no break on various occasions.

19.     The floater pharmacist would print the entire work queue so that the workload appeared to be greater than what was necessary for the store's actual volume. Plaintiff believes this was done to mimic the volume she was accustomed to at her previous location. Plaintiff believes the tactics were only done during her shifts to produce metrics that would create a false perception of incompetency.

20.     The previous location Plaintiff worked at a few years prior was a high-volume location open for 24 hours and filled approximately 800 prescriptions daily.

21.     During corporate's visit to the location, Plaintiff verbalized the work conditions she experienced and the corporate official told the other team members to "take care of their staff" and to "not be mean."

22.     In June 2019, Plaintiff requested a transfer to relocate to Tallahassee.

23.     While the transfer request was pending, Yuricic texted Plaintiff and told her she needed to request a leave of absence for disability because she could not remain an active unscheduled employee. Plaintiff questioned him about what disability he thinks she has and Yuricic did not respond.

24.     Plaintiff further informed Yuricic that she would not be requesting a leave of absence and that his statement was incorrect.

25.     Plaintiff asserts that there were active team members who were unscheduled and allowed to work a couple hours a month to remain active status within the Defendant's system but not Plaintiff.

26.     Plaintiff traveled to Tallahassee at the end of June and contacted location #11537 to determine if they were able to accept her transfer request.

27.     The Pharmacy Manager Amin requested that she and Plaintiff have an informal meeting because she believed that Plaintiff was a technician she heard about and wanted to put a face with the name.

28.     Plaintiff met with Amin and exchanged basic information with her. Amin told Plaintiff she recognized her but did not know where from.

29.     Plaintiff's start date at the Tallahassee location was July 8, 2019.

30.     During Plaintiff's first week of work, she was under the supervision of a floater pharmacist named Marcus L/N/U who began to make inappropriate comments about her to the pharmacist intern Mavis Abreu ("Abreu").

31.     When Plaintiff was instructed to create a claim for the expired medications that had been previously pulled from the shelves, Marcus said to Abreu, "Y'all are gonna let her do y'all returns? She's gon' be stealing the drugs and messing up y'all inventory." Plaintiff ignored the comments.

32.     During this shift Plaintiff was also asked her ethnicity. Plaintiff shared that she is biracial but of Jamaican descent. Marcus asked Plaintiff if she spoke Jamaican and she informed

him the dialect was called Patois. Marcus proceeded to ask Plaintiff to say something. Plaintiff

was apprehensive so Marcus made a statement and asked Plaintiff if she knew what it meant.

33.     Plaintiff was unable to identify any real Patois words from what Marcus said and

believes the act was a mockery of her dialect.

34.     Team members of the store would make references and statements about Plaintiff

having a perceived disability by using code words to identify Plaintiff when conversing in her

presence. By way of example, the team members would change the pronouns in the conversation

from "she" to "he" to assume Plaintiff would not be able to realize they are conversing about her.

35.     Plaintiff overheard Kriausky ask Amin, "How does she know we are talking about

her?" The Pharmacy Manager responded with "Oh well, it would be hard for her to prove."

36.     The perceived disabilities about Plaintiff include but are not limited to attention

deficit hyperactivity disorder (ADHD) whenever Plaintiff would multitask while prioritizing

between duties according to the workflow, dyslexia when prescriptions were misfiled in the

wrong numerical bins associated with the patient's last name inferring Plaintiff misfiled them

even if it was done intentionally and/or mistakenly by another staff member, anxiety whenever

Plaintiff would work in a fast pace or with a sense of urgency to accomplish daily duties and

operational requirements and paranoia as Plaintiff referenced the comments stated about her

directly and indirectly.

37.     Plaintiff's coworkers would re-enact specific events leading her to believe they

were reviewing the surveillance from Defendant's archives. Plaintiff believes this tactic was

utilized to identify whether she had difficulties recalling long-term or short-term memories of

events.

6

38.     As Plaintiff's employment continued, Store Manager Kriausky and other team members would have small conversations internally and externally with customers about Plaintiff.

39.     One particular instance Kriausky was participating in derogatory statements and mockery with a customer regarding Plaintiff. Plaintiff responded to both Kriausky and the customer to acknowledge that she was aware of what was happening and expressed that they did not have to do what they were doing.

40.     When Plaintiff turned to walk away afterwards, Kriausky told the customer that "she was waiting for that moment" in reference to Plaintiff.

41.     Plaintiff shared with Amin that she was aware of what was taking place and her response was "It's not going to stop, so you just have to deal with it. Just focus on the work and not what's being said."

42.     Plaintiff was working under a significant level of duress every day.

43.     Plaintiff was written up for a false mistake made by another pharmacist. The pharmacist participated in an offsite flu clinic and administered a high dose vaccine to a patient that should have received a regular dose vaccine because of their age. When the vaccine records were provided to the pharmacy for data entry after the flu clinic Plaintiff was asked to scan and enter them into the system. Due to this, the information was entered under Plaintiff's initials and she was documented as responsible for the error.

44.     Plaintiff contacted the employee relations third-party hotline to make a report about the hostile work environment during her employment and informed the representative that it was not conducive to productivity and there was an increased risk for errors that concerned Plaintiff.

45.    A week later Plaintiff was contacted by Don Gordon ("Gordon") from corporate to discuss the matter. Gordon called Plaintiff at the store since he was unable to reach her via cellphone but Plaintiff was not able to discuss the matter at work.

46.    Ultimately, the case was closed without resolve.

47.    A second corporate visit was made by Tom L/N/U where he made a direct statement to Plaintiff telling her to "hang in there" and just ignore everything and plow through the work.

48.    The Loss Prevention personnel Nathan Guta ("Guta") visited the store and said to Amin, "at least she will be giving flu shots instead of taking mugshots."

49.    When District Manager Brooks visited, Plaintiff discussed her concerns about the core workflow and daily expectations.

50.    Due to the pharmacy staff having a perceived disability about Plaintiff, every day Plaintiff's competency was tested. The examples include but are not limited to: medications such as a flu vaccine injectable that belonged in the refrigerator were mysteriously placed on a shelf near the expired syringes, empty stock bottles were returned to the shelf instead of being discarded, bottles opened were not marked with an "x" to identify they were not sealed bottles, staff would restock inventory in the wrong locations yielding to medications not being filled, expired medication vials with dates from 2017 and 2018 were on the shelf and CII narcotics were on the floor of the pharmacy in a ziploc bag when they should have been in the safe.

51.    After the failure of trying to prove Plaintiff's incompetency, Kriausky and Amin began to retaliate against Plaintiff by trying to frame her or set her up for failure.

8

52.     From November 2019 to January 2020, Plaintiff was removed from the system daily and would have to reset her password and enter herself back into the system every time she arrived to work.

53.     Plaintiff reported this to management.

54.     During a visit from corporate, Kriausky pretended she had no idea this was occurring and asked why Plaintiff had not said anything about it. Plaintiff told her that everyone was aware that she had to reset her system daily and that this occurs when documentation of registration with the state is not on file.

55.     Plaintiff asked Kriausky what the steps were to become registered and Kriausky gave Plaintiff a notebook to complete. Once completed Plaintiff would take an exam and receive a payee code for the company to pay for the registration fee.

56.     Plaintiff completed the notebook and exam immediately but did not receive the exam link until January 9, 2020. Plaintiff took the exam on January 10, 2020 and passed. Plaintiff received the payee code on January 15, 2020.

57.     Plaintiff asked Kriausky for instructions on completing the registration application and Kriausky said she did not know because the website interface has changed since she last assisted an employee with the application.

58.     Kriasuky was giving Plaintiff the run-around while trying to complete her registration. Kriausky had previously helped employee Rayanna Hogans with this process in a timely manner.

59.     Plaintiff's process took a few months. Plaintiff asserts that the process was prolonged to negate having to pay for the registration of someone they had no intentions of

retaining. Plaintiff overheard the pharmacy manager say to someone that Plaintiff would be gone by February.

60.     False rumors were started and spread about Plaintiff being a former drug addict.

61.     On January 24, 2020, Plaintiff was pulled aside by the pharmacy manager to discuss how she felt about the job. Plaintiff stated that she was okay with the job itself but was not pleased with the statements and rumors that continued to circulate within the workplace.

62.     On January 28, 2020, Plaintiff was scheduled for a 10am to 7pm shift. Just before leaving for lunch break. A customer stated to the pharmacy intern "She doesn't look too happy to be here." Plaintiff responded with "Actually I am having a great day, and I hope you have a great day too!"

63.     Plaintiff proceeded to clock out and go to her car for lunch and made the decision not to return after her lunch. Plaintiff texted Pharmacy Manager Amin that she would not be returning.

64.     On January 29, 2020 Plaintiff arrived to work for a 9am to 5pm shift. Upon entry to the pharmacy, Amin asked Plaintiff if she had spoken to Kriausky prior to reporting to the pharmacy. Amin then informed Plaintiff that she found a pharmacy technician, Hassan L/N/U, from store #10717 to cover Plaintiff's shift. Plaintiff continued to work until the other technician arrived.

65.     Upon the technician's arrival, Kriausky entered the pharmacy and whispered to Amin. Plaintiff was then asked to report to the immunization room by Beth, an office located outside of the pharmacy.

66.     Once inside the room, Amin joined the meeting. Plaintiff was asked "Why did you leave work like that and not return from lunch." Plaintiff explained that she could no longer

take the mistreatment from coworkers. Plaintiff then reiterated the various conversations had in the past regarding this matter.

67.     Plaintiff continued to express that if she was going to continue to work, she demanded the same respect as the other staff. Kriausky called Plaintiff crazy. Plaintiff told her that her perception or opinion of her didn't matter. Kriausky then suggested that Plaintiff was being insubordinate.  When Plaintiff asked how, Kriausky stated "you don't talk to your boss that way." Plaintiff, however, was having a normal conversation with Krisusky.

68.     Kriausky falsely stated, however, she felt threatened by Plaintiff. Plaintiff was asked to leave the store.

69.     After leaving the store, Plaintiff decided to go back to the store to request documentation of the incident that just occurred. Kriausky and Amin were found in the immunization room discussing amongst themselves what had occurred.

70.     Plaintiff eavesdropped on the conversation and heard Kriausky say she was crazy and that they worked with troublesome employees in the past but none like Plaintiff. They opened the door to see Plaintiff to their surprise.

71.     With a look of surprise, Kriausky asked "why are you looking at me like that" and Plaintiff told her she wasn't looking at her in any way but that it was nice to know how they really felt about her.

72.     Plaintiff proceeded to tell them that she doesn't like having conversations in the immunization room where there are no cameras. Plaintiff asked if she could speak to them in the office.

73.     Plaintiff told Kriausky that if she could not provide her with documentation that she needed to contact Brooks. Kriausky called Brooks and placed her on speakerphone. Brooks

told Plaintiff that no documentation would be provided and that Plaintiff had to leave the store because Kriausky and Amin felt unsafe. Brooks said she would contact Human Resources and they would explain how they intend to move forward.

74.    A meeting was held on February 3, 2020 at 4:30pm by Brooks and Guta to discuss the details of the event from Plaintiff's perspective.

75.    Guta asked about the mugshot comments Plaintiff heard in the pharmacy, if she knew who said them. Plaintiff told him yes, she knew who said it. Guta made the comment and was testing Plaintiff's ability to recall it.

76.    Plaintiff explained to Guta that there were too many inexplicable coincidences. During the meeting Guta asked if Plaintiff thought Defendant was investigating her. Plaintiff told him she wasn't sure but he assured Plaintiff that the company was not investigating her.

77.    At the end of the meeting, Plaintiff was placed on an unpaid suspension and no documentation could be provided regarding the suspension or cause of action. The unpaid suspension would be ongoing until a determination could be made contingent on the completion of an investigation.

78.    On February 6, 2020 Brooks contacted Plaintiff via text to inquire if she would like to use her PTO to cover the days she was suspended. Plaintiff requested to receive an email stating her current employment status. Brooks sent an email but it only indicated the suspension, its start date but no reasoning.

79.    Plaintiff also requested for documentation regarding Defendant's Policies and Procedures as it pertained to employee suspensions. Plaintiff did not receive it.

80.     On February 7, 2020, Brooks requested that she and Plaintiff meet on February 8th to discuss how to move forward.  Plaintiff declined informing her it was her Sabbath. Brooks rescheduled for February 10, 2020 at 11am at the store.

81.     On February 10, 2020 Brooks was accompanied by Kriausky at the meeting. The meeting took place in the store's office. It was identified during this meeting that Plaintiff exhibited "behaviors in the workplace," Kriausky stated that in order for Plaintiff to return to work she must sign an authorization to release her medical records to Defendant. Kriausky then provided Plaintiff with a letter stating that she must see a medical professional who would provide "return to work" documentation after a completed evaluation because there were concerns over Plaintiff's ability to perform essential duties. Brooks gave Plaintiff a deadline of February 12, 2020 at 5pm to fulfill this request.

82.     Kriausky explained that once the medical documentation could be provided, Plaintiff would be released from suspension and upon her release, she would receive two final written warnings for attendance and behavior.

83.     On February 20, 2020, Plaintiff met with Brooks once again. During the meeting, Plaintiff declined to provide the requested medical information from February 10th however Brooks told her she may return to work. Plaintiff accepted the offer but requested a transfer to another store. Brooks told Plaintiff that she would not assist with her transfer and that if Plaintiff wanted to transfer, she would have to find out which stores had available hours to accommodate Plaintiff's request.

84.     On May 13, 2020, Plaintiff filed a charge of discrimination with the EEOC. In retaliation for filing the charge and in continued retaliation due, Defendant took disciplinary action against Plaintiff for contrived allegations and reduced her work hours.

85.     Plaintiff transferred to another one of the Defendant's locations, store #4311 in Tallahassee, Florida on March 26, 2020.

86.     On June 23, 2020, there was a power outage in the entire store. While Plaintiff walked out of the pharmacy and to one of the aisles to pick out a magazine, she overheard two of the sales floor workers discussing her personal life in a mockery tone. The two sales floor workers stated excerpts from a conversation Plaintiff had with her daughter about the desire to travel in a recreational vehicle (RV).

87.     On June 26-27, 2020 Plaintiff was scheduled to work by Pharmacist Valencia Bayne ("Bayne"). Bayne was aware of Plaintiff's availability and request not to work on the Sabbath Day which consists of Friday evenings and Saturdays. Instead of Bayne adjusting the schedule, she told Plaintiff she would just have to forfeit the hours. Plaintiff asserts this was a way for Bayne to decrease her hours without being directly accountable. Prior to this incident, Plaintiff overheard Bayne verbalize to the staff that since she now oversees the schedule, she would start to cut Plaintiff hours.

88.     On July 22, 2020, Plaintiff was requested to come in by Bayne to participate in inventory prep. While Plaintiff was working silently cleaning and organizing the shelves, the entire staff participated in making random statements referencing Plaintiff's personal life.

89.     The floater technician Julian L/N/U asked Bria Knighton ("Knighton") if Plaintiff knew they were talking about her and Knighton replied, "Yes, she knows." Julian then proceeded to tell Knighton that Plaintiff was going to leave Defendant and go to CVS. Plaintiff became overwhelmed and left work early.

90.     The next day. Plaintiff spoke to Store Manager Williams again concerning her experiences in the pharmacy. Plaintiff informed him of the various statements she overheard in

14

the pharmacy the day before and let him know that Julian and Knighton's behavior were unacceptable, disrespectful, and not in adherence to the Company's policies and procedures as it pertains to harassment and bullying in the workplace. Williams assured Plaintiff he would address the issues and follow up with her

91.   On July 29, 2020, Plaintiff approached Knighton privately in the pharmacy to seek clarity about the statements Plaintiff overheard earlier in the week. Knighton pretended not to know what Plaintiff was referencing and denied all accusations.

92.   On July 30, 2020, Williams-Bates requested a meeting with Knighton and Plaintiff to find out what transpired the day before. Plaintiff began to explain to Williams-Bates and Williams-Bates suggested that Plaintiff was overthinking and taking things personally and assured her that no one in the pharmacy knew anything about Plaintiff or had been informed about her prior to her employment.

93.   Knighton stated that if everywhere Plaintiff goes and has similar experiences happen then maybe Plaintiff is the problem. Plaintiff explained that she was aware of the manipulation and mind games targeting her.

94.   On August 10, 2020, When Plaintiff entered the pharmacy to start her shift, there was a tote in front of the door unexpectedly that resulted in Plaintiff bumping her shin upon entrance causing it to become swollen and sore.

95.   Plaintiff called out the remainder of the week (August 11 to August 14).

96.   On August 18, 2020 Pharmacy Manager Williams-Bates and Store Manager Williams requested a meeting with Plaintiff. Plaintiff was given a final written warning for excessive absences.

97.     On August 20, 2020 Williams-Bates and Store Shift Leader Carmen Johnson ("Johnson") requested a second meeting with Store Manager Williams appearing via phone. Williams stated that it was brought to his attention that Plaintiff had spoken to Knighton privately in the pharmacy. Plaintiff expressed that she did not have a problem working with Knighton but that Knighton's comments about and/or towards her were unnecessary and requested that she refrain from doing so while Plaintiff is present. Williams also reiterated that Plaintiff was receiving final warnings that would lead to termination for excessive absences and leaving work early.

98.     Plaintiff explained that every time she left work early it was due to unwarranted disrespectful statements or comments of mockery that were adversely affecting Plaintiff's ability to perform her job duties. Plaintiff explained that the environment was not conducive to overall productivity and would increase the likelihood for errors.

99.     Williams told Plaintiff she did not have enough evidence to support her claims. He asked her if there were any witnesses to the experiences. Plaintiff explained that no one would testify on her behalf to jeopardize their jobs.

100.    Plaintiff was constructively terminated on August 31, 2020. On that date, Plaintiff was working with pharmacist Manuel L/N/U and Zenayda Morgan, a senior technician and noticed that work was getting behind. Plaintiff suspected that this was another day of sabotage within the pharmacy so before Plaintiff exited to use the restroom, she made a statement saying that what she has observed was unnecessary and verbalized, "I'm not doing this today. I quit." No reasonable person could have remained in the work environment under these circumstances.

101.    The company used Plaintiff as a scapegoat to cover up the unjust actions of others. The company could not support their claims of incompetency through work performance

so they resulted to insulting Plaintiff's intelligence with mockery, harassment and acts of retaliation.

102.    Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services.  Defendant should be made to pay said fee under the laws referenced above.

## COUNT I
## DISABILITY DISCRIMINATION

103.    Paragraphs 1 through 102 are realleged and incorporated herein by reference.

104.    This is an action against Defendant for disability discrimination brought under Chapter 760, Florida Statutes.

105.    Plaintiff has been the victim of discrimination on the basis of her disability or perceived disability.  During the course of Plaintiff's employment with Defendant, she was treated differently than similarly situated nondisabled/perceived-as-disabled employees.

106.    Defendant is liable for the differential treatment and its refusal to accommodate Plaintiff, as well as its failure to engage in the interactive process with Plaintiff, which adversely affected the terms and conditions of Plaintiff's employment with Defendant.   Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

107.    In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were disability/perceived-disability based and in violation of the laws set forth herein.

17

108.    The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.  The events set forth herein lead, at least in part, to Plaintiff's constructive termination.

109.    Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon disability or perceived disability or her record of having an impairment under the laws enumerated herein.

110.    As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive/equitable relief and to punitive damages.

**COUNT II**
**RETALIATION – Chapter 760**

111.    Paragraphs 1 through 102 are realleged and incorporated herein by reference.

112.    Defendant is an employer as that term is used under the applicable statutes referenced above.

113.    The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting her under Chapter 760, Florida Statutes, and other statutory provisions cited herein.

114.    The foregoing unlawful actions by Defendant were purposeful.

115.    Plaintiff voiced opposition to unlawful employment practices during her employment with Defendant and was the victim of retaliation thereafter, as related in part above.

116.    Plaintiff is a member of a protected class because she reported unlawful employment practices and was the victim of retaliation thereafter.   There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

117.    As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages.  These damages are continuing and are permanent.  Plaintiff is entitled to punitive damages and to injunctive relief.

## COUNT III
## PRIVATE WHISTLEBLOWER RETALIATION

118.    Paragraphs 1 through 102 are incorporated herein by reference.

119.    This is an action brought under §448.101, et seq., Florida Statutes.

120.    As set forth in greater detail above, during the course of Plaintiff's employment, Plaintiff objected to certain practices of Defendant that were in actual or suspected violation of laws, rules and/or regulations.

121.    As a result of Plaintiff' objections, Plaintiff was mocked, harassed and written up. These actions resulted in Plaintiff's forced resignation.

122.    Plaintiff was terminated because she engaged in protected behavior. Specifically, Plaintiff objected to, or refused to participate in, any activity, policy, or practice of Defendant which is in an actual or suspected violation of a law, rule, or regulation and/or reported the violation and gave Defendant an opportunity to correct the problem. Instead of correcting the problem, it got worse and Plaintiff was disciplined and constructively terminated for said reporting.

123.   The disclosures made by Plaintiff are protected under §448.102, Florida Statutes.

124.   As a direct and proximate cause of Plaintiff's participation in the Whistle Blowing activities identified herein, Plaintiff has been damaged, which damages include but are not limited to lost wages and other tangible and intangible damages and every other kind of damage allowed by law. Plaintiff has also suffered emotional pain and suffering damages and other intangible damages that continue today.

125.   Plaintiff is entitled to injunctive/equitable relief.

## COUNT IV
## NATIONAL ORIGIN DISCRIMINATION

126.   Paragraphs 1 through 102 are realleged and incorporated herein by reference.

127.   This is an action against Defendant for national origin discrimination brought under Chapter 760, Florida Statutes.

128.   Plaintiff has been the victim of discrimination on the basis of her national origin. During the course of Plaintiff's employment with Defendant, she was treated differently than similarly situated employees who were not from Jamaican origin.

129.   Defendant is liable for the differential treatment of Plaintiff, which adversely affected the terms and conditions of Plaintiff's employment with Defendant. Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

130.   In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were national origin based and in violation of the laws set forth herein.

131.   The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.  The events set forth herein lead, at least in part, to Plaintiff's constructive termination.

132.   Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon disability or perceived disability or her record of having an impairment under the laws enumerated herein.

133.   As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive/equitable relief and to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a)   that process issue and this Court take jurisdiction over this case;

(b)   that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)   enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)   enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e)   enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)   award Plaintiff interest where appropriate; and

(g)   grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

DATED this 30th day of May 2022.

Respectfully submitted,


/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:  (850) 383-4801
Marie@mattoxlaw.com
Secondary emails:
marlene@mattoxlaw.com
marie@mattoxlaw.com

ATTORNEYS FOR PLAINTIFF